IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

TRISHA GORDON, individually and as
Administratrix of Rodney Lane Gordon's
Estate,

        Plaintiff,

v.                                                                        Civil Action No. 5:12-cv-132

MICHAEL ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

**A. Background**

On July 16, 2012, Rodney Lane Gordon, filed this action under 42 U.S.C. §§ 405(g) and 1383(c) for judicial for review of the decision of the Commissioner of Social Security that partially denied his claims for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 401-433, 1381-1383f. The Commissioner filed his Answer to this Complaint on November 7, 2012. Mr. Gordon and the Commissioner then filed cross motions for summary judgment. Subsequent to the filing of Plaintiff's Motion for Summary Judgment, counsel for Plaintiff learned that Plaintiff died. Trisha Gordon then moved to be substituted as a party on behalf of Mr. Gordon's estate. The Court granted that motion and substituted Trisha Gordon as Plaintiff. Trisha Gordon then filed a response to the Commissioner's motion for summary judgment. The motions are now ripe for this Court's review, and for this report and recommendation.

**B. The Pleadings**

1. Mr. Gordon's Motion for Summary Judgment and Memorandum in Support.

2. Commissioner's Motion for Summary Judgment & Memorandum in Support.

3. Trisha Gordon's Reply to Commissioner's Motion.

**C. Recommendation**

I recommend that:

1. Mr. Gordon's Motion for Summary Judgment be **DENIED** because following decisions by the ALJ are based upon substantial evidence: (1) the decision to reject an opinion that Mr. Gordon had to lie down during the day; (2) that borderline intellectual functioning was not a severe impairment; and (3) that Guideline 201.17 did not apply.

2. Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

## II. FACTS

**A. Procedural History**

Mr. Gordon applied for benefits in April 2009, claiming disability since April 30, 2008. (R. 115, 124). The application for benefits was denied in the first instance, and upon reconsideration. (R. 58-60, 63-65, 72-74, 75-77.) Mr. Gordon then requested a hearing before an Administrative Law Judge (ALJ), which was held on March 9, 2011. Mr. Gordon, who was represented by counsel, testified at the hearing, as did an impartial Vocational Expert (VE). On March 16, 2011, the ALJ issued a partially favorable decision finding that Plaintiff was not disabled prior to February 7, 2011. Mr. Gordon appealed to the Appeals Council (AC), which

denied review of the ALJ's decision, Mr. Gordon brought his claim to this Court.

**B. Personal History**

Mr. Gordon was born on August 9, 1961, and died on November 20, 2012, at the age of 51. He was raised by both parents, who are now deceased, and has five siblings. Mr. Gordon was married once, but divorced, and has two adult children. He quit school in the eighth grade, and during his school years attended special education classes; he never earned a GED. He has worked in the past as a mechanic, security guard, tree trimmer, and at unspecified positions in the construction industry.

**C. Medical History**

The medical history in this case starts on August 21, 2007, with an office note of Susan E. Long, MD. Dr. Long noted that Mr. Gordon presented for evaluation of an abdominal wall hernia after he was seen in an emergency room a few weeks earlier.[1] (R. 193.) The doctor examined Mr. Gordon and reported a "reducible ventral hernia through one of the retention suture sites,"[2] and that the site was nontender. (*Id.*) Dr. Long informed Mr. Gordon that, because of his morbid obesity, she would not repair the hernia at his current weight; at the time the hernia was not an emergency. (*Id.*) The doctor advised Mr. Gordon to not lift anything that would increase the risk of incarcerating the hernia, and "strongly suggested that he lose 100 pounds" so she could repair the hernia. (*Id.*)

On June 16, 2009, Mr. Gordon was transferred from St. Joseph's Hospital to the University of Pittsburgh Medical Center (UPMC) after Dr. Long found that he had a "partial

---

[1] The hernia was a result of Mr. Gordon lifting a transmission.

[2] It appears from the record that Mr. Gordon underwent surgery to repair seven hernias in 2002, and had an exploratory laparotomy for bowel obstruction from the hernia. (R. 195-96, 204.)

small bowel obstruction and incarcerated ventral hernia," and "an infected abdominal wall, which ha[d] been infected for several years." (R. 238.) Dr. Long further noted Mr. Gordon's failure to take care of the infection. (*Id.*) Jason Sperry, M.D. treated Mr. Gordon at UPMC, and also spoke to him about the effect of his obesity on the hernias and the difficulty of surgery because of his weight. (R. 388.)

One week after Mr. Gordon was released from the hospital he presented to the emergency room with nausea and vomiting. (R. 253.) He was discharged that day, but returned two days later for evaluation of increased bloating and vomiting. (R. 254-57.) Mr. Gordon was again transferred to UPMC, and discharged on June 26, 2009, with instructions to not lift more than ten pounds and consult with his primary physician to discuss healthy lifestyle modifications. (R. 375.) All CT scans performed revealed the same significant abdominal wall hernias with bowel loops, and did not rule out partial obstruction.[3] (R. 242-43, 253, 348-60.)

Mr. Gordon did meet with his primary care physician, Josh Baker, PA-C, several times following discharge from UPMC. On July 13, 2009, Mr. Baker noted that the hernia was stable and all abdominal pain was gone. The following month, Mr. Baker noted that the hernia was still stable, that Mr. Gordon reported feeling better, and that he was making attempts to lose weight and live healthier; in fact, he had lost thirty pounds. (R. 282.) At all subsequent visits, Mr. Baker noted that the hernias were stable. (R. 317, 219, 322, 325.)

On July 8, 2009, x-rays were taken of Mr. Gordon's knees, which showed mild degenerative osteophytes. (R. 237.) One week later, Arturo Sabio, M.D. performed a physical examination at the behest of the West Virginia Disability Determination Service. (R. 195-99.)

---

[3] Because of Mr. Gordon's weight, doctors had some difficulty performing and reading the diagnostic imaging.

Mr. Gordon's chief complaints at this examination were diabetes, high blood pressure, high cholesterol, arthritis, and hernia, and Dr. Sabio reviewed ten pages of records, including a CT scan of the abdomen that showed the hernia, to aid in his assessment. (R. 195.) Dr. Sabio's diagnostic impression was that Mr. Gordon suffered from hypertensive cardiovascular disease, Type II diabetes, morbid obesity, osteoarthritis in both knees, and a recurrent ventral hernia. (R. 198).

In his summary, Dr. Sabio noted that Mr. Gordon's blood pressure and vital signs were normal, and that he did not have chest pains, tachycardia, or palpitations, and was not in congestive heart failure. (R. 199.) Further, the doctor did not report any aggravating factors from Mr. Gordon's diabetes. (*Id.*) With regard to the hernia, Dr. Sabio noted drainage from the scarring of the 2002 operation for his hernia, and that Mr. Gordon had "palpable recurrent hernia in the abdominal wall on both sides of the scar." (*Id.*) Finally, with regard to Mr. Gordon's knees, the doctor found "stiffness in both knees with pain restricting the flexion of both knees to 90 degrees and zero degrees of extension." (*Id.*)

On August 3, 2009, Robert J. Klein, Ed.D., issued a mental profile of Mr. Gordon, which included a mental status evaluation and intelligence testing. (R. 203-07.) Dr. Klein found that all of the following were within normal limits: thought process, thought content, perception, immediate memory, concentration, and persistence. (R. 206.) However, his recent memory was markedly deficient, his remote memory was moderately deficient, and his pace was mildly deficient. (*Id.*) Moreover, the doctor noted that Mr. Gordon's length and depth of verbal responses was mildly underproductive. (*Id.*)

With regards to Mr. Gordon's intellectual functioning, Dr. Klein administered the WAIS-III, which produced a verbal IQ of 77, performance IQ of 89, and full scale IQ of 80. (R. 205.) The doctor opined that the results were valid, and, "[a]t most, the results would indicate a Borderline Level of Intellectual Functioning." (*Id*.) Further, Dr. Klein administered the WRAT-IV, which placed Mr. Gordon between the second to third grade level in word reading and spelling, and between the fifth and sixth grade level in sentence comprehension and math. (*Id*.) Again, the doctor found these to be an adequate representation of Mr. Gordon's abilities. (*Id*.) Dr. Klein diagnosis included a reading disorder, disorder of written expression, and borderline intellectual functioning, and indicated a poor prognosis. (R. 207.)

On August 11, 2009, Frank Roman, Ed.D., performed a psychiatric review of Mr. Gordon. (R. 208-221.) Dr. Roman did not find a severe impairment based on Mr. Gordon's learning disability. (R. 208-09.) Further, Dr. Roman found only mild restrictions of activities of daily living, difficulties in maintaining social function, and difficulties in maintaining concentration, persistence, or pace. (R. 218.) Finally, the doctor noted that Mr. Gordon had no history of psychiatric treatment, and that he is no longer working due to physical concerns, in his determination that his learning disability was nonsevere. (R. 220.) These findings were affirmed as written by Joseph A. Shaver, Ph.D. on November 5, 2009 (R. 300.)

The day following the psychiatric review, Rogelio Lim, M.D, performed a physical residual functional capacity assessment. (R. 222-29.) After reviewing the records on file, the doctor found that Mr. Gordon could occasionally lift fifty pounds, frequently lift twenty-five pounds, and stand, walk, or sit for about six hours in an eight-hour workday. (R. 223.) In fact, the only limitations that Dr. Lim placed on Mr. Gordon was that he should only occasionally

climb ladders ropes and scaffolds, and that he should avoid concentrated exposure to extreme cold and vibrations. (R. 224-26.) In making this determination, the doctor found that Mr. Gordon's complaints were not credible based on the evidence. (R. 229.)

On January 7, 2010, Atiya M. Lateef, M.D. performed a second physical residual functional capacity assessment, this time limiting Mr. Gordon to light work. (R. 301-08.) The doctor concluded that Mr. Gordon could occasionally lift twenty pounds, frequently lift ten pounds, and stand, walk, or sit for six hours in an eight-day workday. (R. 302.) The assessment further noted that Mr. Gordon should only occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, and should never climb ladders, ropes, or scaffolds. (R. 303.) The doctor also opined that Mr. Gordon should avoid concentrated exposure to hazards. (R. 305.)

On March 2, 2011, Mr. Baker, the primary physician, submitted a letter to Mr. Gordon's counsel in this matter advising that Mr. Gordon would need to recline or lay flat during the day to avoid further damage from the hernias. (R. 309.) Further, on March 20, 2012, Mr. Baker, along with Aimee Whitehair, M.D., submitted a letter to counsel about the severity of the hernias, and how the hernias limit Mr. Gordon's daily activities, including requiring him to lie down during the day. (R. 416.) This letter was not before the ALJ; rather it was submitted to the Appeals Council. Finally, Rodney, McCullough, M.A., performed the WRAT-IV in March 2012, which yielded the same results as the test performed by Dr. Klein, and opined that Mr. Gordon was functionally illiterate. (R. 412-13.)

**D. Testimonial Evidence**

Mr. Gordon testified that his main medical problem is his hernia. He cannot lift anything heavier than a gallon of milk, and that whenever he does lift the softball size hernia on his right

7

side will push through his abdominal wall. (R. 37.) He testified that he has tried to lose weight at the doctors' suggestion so he could get the surgery to fix it, but he was unsuccessful at the diets. (R. 38-39). There was one surgeon in Pittsburgh that was willing to operate despite Mr. Gordon's weight, but he testified that he was scared of another surgery because the last one left a hole in his stomach that still had not healed. (R. 38, 42.) In addition to the diabetic diet he was on, Mr. Gordon tried to exercise by walking, albeit in a limited amount due to his arthritic knees, and by lifting three pound weights while he was sitting inside. (R. 39-40, 43-44.) Mr. Gordon testified that he lives with this daughter, who works and pays the bills at the house, and that his daily activities are very limited. (R. 40-41.) His daily routine consists of waking, having a small breakfast, doing any laundry he might have, and then sitting around the house. (R. 41) Occasionally, he will try to take short walks outside. (*Id*.)

The ALJ then asked the VE to classify Mr. Gordon's past work, which ranged from unskilled to semi-skilled, and from light exertional level to heavy. (R. 45.) The ALJ then posed a hypothetical that fit Mr. Gordon's age, education, and work experience, and limited it to a light exertional level with further limitations. (R. 46.) The VE testified that this person would be able to perform past relevant work, namely the positions of security guard and flagger. (*Id*.) Further, the VE identified several other jobs that could be done by that person. (R. 47.) The ALJ then reduced the exertional level to sedentary and asked whether the hypothetical person could perform Mr. Gordon's past work, or any other work in the national economy. (*Id*.) The VE responded that although the reduction to sedentary would preclude the hypothetical person from performing Mr. Gordon's past work, there are still several jobs that exist in the national economy which that person could perform. (*Id*.) Finally, the ALJ added a limitation for

the hypothetical person exceeding employer tolerances for being off task and absent, and asked whether there are jobs in the national economy for this person. (R. 48.) The ALJ responded that there would not be any jobs. (*Id.*)

### III. THE MOTIONS FOR SUMMARY JUDGMENT

**A. Contentions of the Parties**

Mr. Gordon's raises several points of error that he believes shows the decision was not based upon substantial evidence: (1) that the ALJ failed to consider a treating physician recommendation that Mr. Gordon needed to lie down during the day, and that there was no contradictory evidence to that recommendation; (2) that the ALJ failed to included limitations for Mr. Gordon's borderline intellectual functioning in the hypothetical; and (3) that the ALJ misapplied Medical Vocational Guideline 201.17. The Commissioner, on the other hand, contends that the ALJ's decision was based on substantial evidence.

**B. The Standards**

*1. Summary Judgment*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon

mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

*2. Judicial Review*

Only a final determination of the Commissioner may receive judicial review. *See* 42 U.S.C. §405(g), (h); *Adams v. Heckler*, 799 F.2d 131,133 (4th Cir. 1986). Moreover, An ALJ's findings will be upheld if supported by substantial evidence. *See Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998). Substantial evidence is "not a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), but that which a "reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Further, the "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

*3. Social Security - Medically Determinable Impairment - Burden.*

Mr. Gordon bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); *Heckler v. Campbell*, 461 U.S. 458, 460 (1983).

**C. DISCUSSION**

*1. The Treating Physician Recommendation*

Mr. Gordon contends that the ALJ should have accepted a medical opinion that he must lie down during the day to avoid aggravating and further injuring his hernias. This opinion appears twice in the record: once by Mr. Baker, a physicians assistant that provided primary

care to Mr. Gordon, and once in a letter by Mr. Baker that was coauthored by Dr. Aimee Whitehair. The former was considered by the ALJ, but the latter was submitted to the Appeals Council after the ALJ's decision.

The opinion by Mr. Baker came in a letter written to Mr. Gordon's counsel in this case, and stated that his "ventral hernias and his protuberant abdomen may make sitting upright for extended periods uncomfortable for him and he may need to recline or lay flat for some time throughout the day." (R. 309.) The ALJ explicitly rejected this opinion, stating that "as a nonacceptable medical source, Mr. Baker's opinion is not necessarily devoid of probative value, but in this specific case, I find that his opinion is outweighed by the assessments of Dr. Lateef, who possesses superior qualifications in assessing the claimant's functional limitations." (R. 23.) The ALJ further noted that there was no support in the record for the opinion that Mr. Gordon would need to lie down during the day. (*Id.*)

It is the duty of the administrative law judge, and not this Court, to weigh conflicting evidence. *See e.g. Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Here, the ALJ did just that and resolved the conflict by affording little weight to Mr. Baker's opinion. The decision to do that was based upon substantial evidence. First, as the ALJ noted, Dr. Lateef concluded that Mr. Gordon could stand or sit for six hours out of an eight hour workday. (R. 301-08.) Further, on August 12, 2009, Dr. Lim found that Mr. Gordon was capable of sitting or standing for six hours, and specifically found that the hernia was not limiting. (R. 223, 229.) Finally, Mr. Gordon's own description of his daily activites, including taking short walks for exercise, cooking, and doing laundry, run counter to Mr. Baker's opinion. Thus, the ALJ's decision to give Mr. Baker's opinion less weight is based upon this other substantial evidence.

Mr. Baker's later letter, which was co-authored by Dr. Whitehair, was not before the ALJ. However, it was considered by the Appeals Council when it denied review of the ALJ's decision (R. 4.). Therefore, the letter is incorporated into the record before this Court in determining whether the ALJ's decision is based upon substantial evidence. *See Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). The Court finds that even with the injection of this letter into the record, the ALJ's decision is still based upon substantial evidence and a remand is not necessary for the ALJ to review the letter.

When consideration of the record as a whole reveals that new evidence from a treating physician is not controverted by other evidence in the record, then the Court should find that a denial of benefits is not supported by substantial evidence. *See Id*; *Meyer v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011). However, if the record provides "an adequate explanation of the Commissioner's decision," and the new evidence is controverted by other evidence, then the Court can find that the Commissioner's decision is based upon substantial evidence. *Id*. The letter submitted by Mr. Baker and Dr. Whitehair is both cumulative of the information already in the record, and is, in fact controverted by several other medical opinions.

First, the letter explains Mr. Gordon's obesity. The ALJ explicitly considered Mr. Gordon's obesity, finding that he had a Body Mass Index of 49.5. (R. 20.) The ALJ understood Mr. Gordon's obesity, and the role that obesity plays in aggravating other ailments, but found that the record showed that it did not "indicate any significant immobility or inability to ambulate effectively, or establish any end organ damage." The record shows just that, because Mr. Gordon, and every provider, noted that he could move about, including doing household chores, going shopping, and exercising, and actually recommended that he partake in such

activities to facilitate weight loss, which would eventually allow for surgery to repair the hernias.

The letter further notes the severity of the hernias, and the incarceration of the bowel by the hernias. There was plenty of evidence in the record from a number of sources, all considered by the ALJ, regarding the severity of the hernias. All of these medical source opinions were consistent in that they recommended that Mr. Gordon lose weight to enable them to perform surgery. Even Mr. Baker found that the hernias were stable and pain free during the time frame in question, and noted Mr. Gordon's attempts to exercise and lose weight. (*See e.g.* R. 317, 319, 322, 325). Further, when Mr. Gordon was discharged from the hospital for the partial small bowel obstruction he was not given any restrictions on his activity, and was only advised to not lift ten pounds. (R. 375.)

The letter concludes that Mr. Gordon should not "lift or exert at any level over ten pounds. Then with even mild to moderate activity, he must constantly have the opportunity to lie down to facilitate the avoidance of deadly hernias." (R. 416.) This is merely a recitation of Mr. Baker's March 2011 letter that was considered by the ALJ. Although the letter now has an M.D.'s name attached to it, there is nothing to suggest that it would change how the ALJ treated the opinion. The ALJ specifically rejected the idea that Mr. Gordon would have to lie down during the day, because there was no other support for it in the record.[4] To the contrary, every other source placed little to no restrictions on his activity. Finally, it is noteworthy that the ALJ accounted for more limitations than any other medical source opined by placing Mr.

---

[4] Plaintiff brings to the Court's attention a general surgery history and physical from UPMC that notes an ameliorating factor to the abdominal pain is lying flat, and an exacerbating factor is walking. (R. 394.) This appears to be based on Plaintiff's account of the pain and what helps or makes it worse, and it is important to note that on the same day Mr. Gordon was released with no restrictions on his physical activity. (R. 375.)

Gordon's RFC at the sedentary level. Accordingly, even considering the letter, which is not new evidence, the ALJ's decision to reject the suggestion that Mr. Gordon would need to lie down is based on substantial evidence.[5]

*2. Borderline Intellectual Functioning Limitation*

Mr. Gordon contends that the ALJ's decision to find his borderline intellectual functioning to be a non-severe impairment was not based on substantial evidence. It then follows that the ALJ erred by not including limitations in his RFC to the VE, rendering the VE's opinion flawed. The ALJ acknowledged that Mr. Gordon's diagnosis of borderline intellectual functioning was a medically determinable impairment, but found that the impairment created no functional limitations. (R. 20.) Specifically, the ALJ found that despite being in special education classes, Mr. Gordon has been able to work for the better part of thirty years in mostly semi-skilled jobs. Further, the ALJ noted that Dr. Roman opined that Mr. Gordon's learning disability was non-severe, and that Dr. Shaver affirmed that finding.

Specifically, the ALJ adopted the opinion of Dr. Roman who found only mild limitations in restrictions in: activities of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence, or pace. Further, Dr. Roman found no episodes of decompensation. (R. 218.) This is line with the opinion of Dr. Klein, (R. 206-07), and was affirmed by Dr. Shaver. (R. 300.) All of this is in line with the federal regulations.

When an ALJ finds an impairment, she must specify the findings that show an existence of impairment, and then rate the degree of functional limitation resulting from the impairment.

---

[5] Mr. Gordon also argues that the ALJ created an evidentiary gap by disregarding Mr. Baker. However, the ALJ only rejected Mr. Baker's view that Mr. Gordon needed to lie down, and did not create a gap in the evidentiary record by doing so.

14

20 C.F.R. §§ 404.1520a(b)(1), *et seq.* and 416.920a(b)(1) *et seq*. Functional limitation is rated by measuring activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation. *Id*. at §§ 404.1520a(c)(3) and 416.920a(c)(3). A rating of "none" or "mild" in the first three areas, and a rating of "none" in the fourth area will generally lead to a conclusion that the mental impairment is not "severe," "unless the evidence otherwise indicates that there is more than a minimal limitation in [the] ability to do basic work activities." *Id*. at §§ 404.1520a(d)(1) and 416.920a(d)(1).

This is precisely the process followed by the ALJ. He first determined that there was an impairment based upon Dr. Klein's report. He then measured the functional limitations, of which the first three areas received a mild limitation, and no episodes of decompensation were noted. And the evidence does not otherwise suggest more than a minimal limitation on the ability to do basic work. Quite contrary, the evidence shows that Mr. Gordon has been employable for decades. Accordingly, the ALJ's decision to find that borderline intellectual functioning was not a severe impairment is based upon substantial evidence.

*3. Medical-Vocational Guideline 201.17*

Mr. Gordon contends that Medical Vocational Guideline 201.17 should have directed the ALJ to find that he was disabled. Under Guideline 201.17, if an individual is age 45-49, illiterate or unable to communicate in English, and has no past work history, or a history of only unskilled work, then that individual is considered disabled. 20 C.F.R. § 404, app. 2, s. 201.17. The ALJ found that Mr. Gordon "has a limited education and is able to communicate in English." (R. 24.) Further, the ALJ found that Mr. Gordon's acquired no transferable skills from his past unskilled or semiskilled work. (R. 24.) Thus, the ALJ found that Guideline 201.19

15

directed a finding of not disabled.[6] (R. 25.) The Court finds that this decision is based upon substantial evidence.

Mr. Gordon fails to meet the 201.17 requirement that a claimant either be illiterate or unable to communicate in English. Although there was one opinion submitted that Mr. Gordon was "functionally illiterate," the ALJ's opinion, which was based upon the record evidence, conforms with the federal regulations. Under 20 C.F.R. § 404.1564(b)(1), illiteracy is defined as the "inability to read or write." This is determined if "the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." *Id*. Conversely, someone with a limited education has "ability in reasoning, arithmetic, and language skill, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs." 20 C.F.R. § 404.1564(b)(3) A limited education is generally attained by reaching seventh through eleventh grade. *Id*.

The record shows that Mr. Gordon reached the eighth grade in school before dropping out. Thus, he fits squarely within the definition of limited education as defined by the regulations. Further, there has been no showing that Mr. Gordon could not read or write. To the contrary, he testified that he could speak, read, and understand English., and that he could follow written instructions. (R. 135-36, 153). Finally, using Mr. Gordon's own account of his abilities as attested in his function reports, he can drive, grocery shop, pay bills, count change, handle a savings account, and use a checkbook. (R. 150, 160-61.) All of this is consistent with the ALJ's determination that Mr. Gordon had a limited education, rather than being illiterate,

---

[6] Guideline 201.19 directs a finding of not disabled if an individual is age 45-49, has limited or less education, and has no transferable skills from prior skilled or semi-skilled work. 20 C.F.R. § 404, app. 2, s. 201.17.

and that 201.19 directed a finding of not disabled. Thus, that decision is based on substantial evidence. *See e.g. Hernandez v. Comm. of Soc. Sec.*, 2009 WL 2983089, *2 (W.D. Va. Sept. 9, 2009) (finding that even though record showed mental challenges and test scores in the first grade, claimant was not illiterate); *Williams v. Astrue*, 2011 WL 1261339, *10 (D.S.C. Feb. 2, 2011) (finding that functional illiteracy is not the same as definition of illiteracy in regulations).

## IV. RECOMMENDATION

Although it is a sad occasion that Mr. Gordon died from complications of the hernias that were the basis for his claims of disability, the Court cannot use this factor *ex post* in determining whether the ALJ's decision to deny benefits was based on substantial evidence. In reviewing the record, the Court concludes that the ALJ's decision was based on substantial evidence, and **RECOMMENDS THAT**:

1. Mr. Gordon's Motion for Summary Judgment be **DENIED**.

2. Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28

U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985): *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

DATED: February 12, 2013      */s/ James E. Seibert*
                JAMES E. SEIBERT
                UNITED STATES MAGISTRATE JUDGE